**Thomas HORN, et al., Plaintiffs,**

**v.**

**Robert B. McQUEEN, et al., Defendants.**

**No. Civ.A.98–591.**

United States District Court,
W.D. Kentucky,
Louisville Division.

July 29, 2002.

E. Douglas Richards, Lexington, KY, Alfred H. Sigman, Todd F. Jackson, Sigman, Lewis & Feinberg PC, Oakland, CA, David M. Cook, Cincinnati, OH, for Plaintiffs.

John J. McLaughlin, Sherry P. Porter, Goldberg & Simpson, Stephen M. Pitt, Wyatt, Tarrant & Combs, Louisville, KY, D. Kirk Shaffer, Joel T. Galanter, T. Steven Perry, Brad A. Lampley, Stokes, Bartholomew, Evans & Petree, Nashville, TN, for Defendants.

## MEMORANDUM OPINION AND ORDER

COFFMAN, District Judge.

This matter came before the court for trial on April 16–18, 24 and 26, July 16–18, October 9 and 11, 2001, and February 25–26, 2002. The plaintiffs are all former correctional officers at prison facilities owned and operated by U.S. Corrections Corporation ("USCC"), and they all were participants in the USCC Employee Stock Ownership Plan ("Plan" or "ESOP"), an employee benefit plan governed by the Employee Retirement Income Security Act of 1975 ("ERISA"). Plaintiffs sue derivatively on behalf of the ESOP pursuant to ERISA § 409, 29 U.S.C. § 1109 and ERISA § 502(a)(2), 29 U.S.C. §§ 1132(a)(2), and sue pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). The defendants are Milton Thompson ("Thompson") and Robert McQueen ("McQueen"), both of whom were stockholders in and officers of USCC. Thompson and McQueen became trustees of the ESOP when it was established in late 1993 and early 1994. USCC and its successor corporation Corrections Corporation of America ("CCA"), which were defendants, reached a separate settlement with the plaintiffs before trial.

Plaintiffs allege generally that Thompson and McQueen breached their fiduciary duties to the ESOP by (1) failing to make a prudent investigation into the ESOP's investment of $34,457,353 for a 66.03% interest in the common stock of USCC; (2) causing the ESOP to pay more than "adequate consideration" or fair market value for the employer securities that it purchased on March 15, 1994; and, as a result, (3) causing losses to the ESOP in the amount of $14,800,000 plus the gains that amount would have earned if invested in another instrument, from March 15, 1994 to present. The plaintiffs further allege

that the trustees engaged in transactions prohibited under ERISA § 406, 29 U.S.C. § 1106(a), when they purportedly caused the ESOP to purchase employer securities for more than "adequate consideration." After fully considering the evidence and the arguments of counsel, the court hereby makes the following Findings of Fact and Conclusions of Law.

### Background

USCC was founded by Thompson and his long-time business associate, Clifford Todd ("Todd"). Todd was a commercial developer and Thompson was an architect. Todd became CEO of the company. His role tended more to financial matters, while Thompson's role related more to the facilities and architectural side of the business. Subsequently, they hired McQueen, who had substantial government experience, as Vice President of Governmental Affairs. McQueen's primary responsibility was to assist in interfacing and negotiating with the various government entities with which USCC hoped to contract. McQueen was ultimately given an equity interest in USCC by Todd and Thompson.

Before merging with CCA in 1998, USCC operated private prisons under various contracts with state and county governments, principally in the Commonwealth of Kentucky. Under these contracts, the governmental entity agreed to pay USCC a set daily rate to incarcerate, feed, and otherwise care for inmates assigned to USCC's various facilities. USCC secured its first contract in 1986 and thereafter acquired additional contracts. In late 1993, Todd and Thompson

each owned 112.5 shares of common stock of USCC and McQueen owned 15 shares of non-voting common stock.[1] Thus, Todd and Thompson owned equal, 50% voting interests in USCC, and they each owned 46.875% of the total stock of USCC. Todd, Thompson, and McQueen were all actively involved in the management of USCC, and were all salaried officers of the corporation until Todd sold his shares to the ESOP in March 1994.

By late 1993, Todd (who was then sixty-six years old) wanted out of the prison industry and was interested in selling his shares in USCC.[2] Thompson and McQueen wanted to maintain control of the company, so they began looking for a way to buy out Todd. James McFerran, a senior vice president at the Bank of Louisville ("BOL"), suggested establishing an ESOP. BOL had an existing banking relationship with USCC, having extended several real estate and other loans to the company. McFerran then contacted attorney Steven A. Goodman, an attorney with a Louisville law firm, and Paula Teegarden, an agent who underwrote insurance relating to ESOP transactions. McFerran knew that Goodman and Teegarden often worked together on ESOP transactions. Because the proposed ESOP loan transaction would be the largest that BOL had, representing about one-half of the total investment that Bert Klein, BOL's largest shareholder, had in the bank, Klein directed Joy Siegel, a BOL credit officer who had been involved in several ESOP transactions before joining BOL, to analyze the ESOP transaction. McFerran also introduced Thompson and

---

**1.** Some of the Todd and Thompson shares were owned by family members; for purposes of clarity these interests will be referred to singularly as the Todd shares or the Thompson shares. In addition, there had been a previous 2.5–to–1 stock split, before which both Todd and Thompson owned 45 shares, and McQueen owned 6 non-voting shares.

**2.** There was much contention at the trial before this court about various organizations' alleged interest in obtaining Todd's shares; this issue will be addressed in greater detail in the analysis below.

McQueen to CPA Steven Kerrick, of the accounting firm Carpenter & Mountjoy ("C & M") in Louisville. C & M (specifically, Kerrick) was initially engaged to advise Thompson and McQueen on the structure of any proposed ESOP; later, he performed a valuation.

In accordance with his new engagement, Kerrick prepared a document dated December 1, 1993, that proposed several scenarios for structuring a potential ESOP for USCC, and he explained to Thompson and McQueen how each scenario would operate. In preparing these scenarios, Kerrick assumed that the value of USCC was $50 million and derived certain calculations from that hypothetical value. Kerrick then used the results from his hypothetical to illustrate the options available to USCC. One scenario Kerrick proposed was Scenario IIb, under which the ESOP would purchase Todd's shares for $15,624,990, and USCC would issue new shares and sell them to the ESOP for an amount equal to USCC's existing debt, which was assumed to be $15,277,668. USCC's existing debt was essentially mortgage debt secured by the prison facilities themselves, and USCC could deduct only the interest payments on such debt for income tax purposes.

Restructuring USCC's existing debt through the ESOP would create certain benefits for USCC. Contributions to a qualified employee benefit plan are fully deductible, and by restructuring its existing debt as ESOP debt, USCC could effectively pay both the principal and interest on its existing debt in the form of a fully deductible contribution to a benefit plan. In addition, the law in 1994 provided that an institutional lender could exclude from its taxable income one-half of the interest income that it received on a loan to an ESOP that owns at least a 50% interest in the sponsoring company. As a result, interest rates on loans to such ESOPs were usually lower than on other similar commercial loans.

Initially, Todd had been discussing a payment of around $25 million for his and his family's USCC stock. By the latter part of 1993, after the concept of the ESOP, with its attendant tax benefits, was discussed, Todd had formulated the amount of around $20 million as what he and his family wanted for their shares and did not care how it was broken down. Being aware that a sale to an ESOP would not be subject to income taxation, Todd ultimately agreed to accept $15,624,990 in cash, for his and his family's shares. This was figured by Kerrick at $347,222 for each of the 45 Todd shares. Based upon their beliefs as to the value of USCC, Thompson and McQueen believed that the ESOP would get a bargain for the majority of USCC's stock at this price. In addition, Todd agreed to consulting and non-compete agreements totaling (after taxes, for which USCC was responsible) another $3,525,010. USCC was to pay quarterly taxes for Todd estimated to total $850,000 ($42,500 per quarter for five years). Todd would receive a total of $20 million. Considering the tax benefits because of the ESOP, this sum was the practical equivalent of around the $25 million Todd had originally discussed. Given that the Todd family owned 47% of the USCC stock, this transaction implied a $50 million total value for USCC.

USCC created the ESOP on December 23, 1993, effective as of January 1, 1993. At the time, USCC had a 401(k) retirement plan already in existence, but it was placed in suspension and its assets remained invested. Thompson and McQueen became the trustees for the ESOP on or about December 23, 1993. The ESOP—acting through the trustees—then entered into two separate stock purchase agreements ("SPAs") dated Decem-

ber 31, 1993. The first SPA committed the ESOP to purchase all of Todd's shares for $15,624,990, the exact price estimated in hypothetical Scenario IIb. The per-share price in both Scenario IIb and the Todd SPA was $347,222 pre-split, or $138,888.80 after the stock split. In the second SPA, the trustees committed the ESOP to purchase newly issued shares from USCC itself at the same per-share price, for an additional $15,277,768. It is not clear on what date the trustees signed the SPA committing them to purchase the newly issued shares.

Prior to their becoming trustees, Thompson and McQueen's planning and work had been for USCC, not the ESOP; neither had any substantial expertise in accounting and business valuation matters. They retained Steven Kerrick of C & M to perform a valuation of the stock. Although C & M's engagement letter for this valuation is dated December 6, 1993, the defendants assert that the valuation process began prior to this date. The parties' views of both the timing and the merits of this valuation differ greatly; the defendants contend that it was a thorough, on-going process undertaken in good faith, while the plaintiffs cast it as a hurried formality, undertaken with a predetermined result designed to meet Cliff Todd's price and deadline for the transaction. Additionally, both parties presented valuation experts who testified at trial regarding the merits of Kerrick's valuation and the actual value of the USCC stock in March, 1994. The plaintiffs rely on the testimony of Jeffrey Risius, while the defendants rely, in addition to Kerrick, on the testimony of James Gravitt and Cate Elsten. The court will speak to these differing accounts below.

For better or for worse, Kerrick ultimately concluded that USCC was worth in excess of $52 million, or a per-share price of $132,472.[3] The ESOP borrowed a total of $34,427,353 and used the proceeds to acquire approximately 66% of the outstanding shares of USCC. The transaction closed on March 15, 1994.

Subsequent to the March 15, 1994 closing, a 10,000–for–1 stock split occurred, resulting in USCC's having 3,935,600 shares of stock outstanding. This was done so that more stock would be available for allocation to ESOP participants over time. Pursuant to paragraph 4.1 of the ESOP, shares became allocated to participants on a pro rata basis, as payments of interest and principal were made on the ESOP loan. As the debt was paid off, more shares became allocated to each participant's account. In 1996, an investor group led by J.H. Whitney & Co. and some other participants, including Chase Venture Capital Associates, agreed to purchase about 33 percent of the USCC stock. In exchange for Whitney's agreement to invest $20 million in the equity of USCC and to lend an additional $40 million to the company in exchange for subordinated debentures, USCC was obligated to terminate the ESOP and to use as much as necessary of the Whitney proceeds to pay off the ESOP debt, with the vested participants in the ESOP (the USCC employees) having the option either to cash out their shares in the ESOP or to retain them as stock in USCC, either personally (paying necessary taxes on their gain) or rolling over the value of the stock into the reinstated § 401(k) plan or an IRA. In January, 1997, Thompson and McQueen ceased being the ESOP trustees and were replaced by Marine Midland Bank of New York. The Whitney transaction was consummated in March, 1997, at which time the ESOP terminated and participants representing approximately 50% of the

---

**3.** The actual number in Kerrick's final report is $136,385 per share. This amount was later adjusted to $132,472 to account for a distribution of retained earnings.

ESOP's shares elected to receive cash of $15.49 per share for their allocated shares in USCC. The other 50% elected to receive stock in USCC having the same per share value, $15.49, either directly or through the reinstated § 401(k) plan or an IRA. A year later, on April 17, 1998, CCA, the nation's largest private prison company, acquired USCC for over $170 million in cash and the assumption of additional millions of dollars in debt. Thereafter, the plaintiffs brought this action.

## Analysis

The plaintiffs brought this action against the defendants, alleging that they breached their fiduciary duties under ERISA, 29 U.S.C. § 1001, et seq. These fiduciary duties arose with USCC's creation of an ESOP designed to finance the leveraged buyout of Clifford Todd's shares. ESOPs are "employee benefit plan[s] designed to invest primarily, or when certain safeguards are present, solely in securities issued by the sponsoring company. Under ERISA, ESOPs are subject to a web of rules and regulations governing their creation, maintenance, and administration." *Reich v. Valley National Bank*, 837 F.Supp. 1259, 1262 (S.D.N.Y.1993). To encourage the establishment of such plans, sponsoring companies are given substantial tax benefits.

Trustees of these plans, however, bear substantial fiduciary duties. ERISA § 404 (codified at 29 U.S.C. § 1104) sets up a general fiduciary standard, whereby a plan trustee "shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries ... with the care, skill, prudence, and

diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." Additionally, ERISA § 406 (codified at 29 U.S.C. § 1106) prohibits certain transactions between a plan and a party in interest, such as an employer. ERISA § 408(e) (29 U.S.C. § 1108(e)), however, provides an exemption that allows for the creation of ESOPs and the purchase of employer securities, as long as the sale or acquisition is for "adequate consideration."[4] The alleged breach of this requirement, with the plaintiffs' accusation that the ESOP paid more than adequate consideration for the USCC stock purchased, is the gravamen of this case.

Before this court can render its conclusions of law, however, certain disputes must be resolved. Specifically, the parties disagree on three major issues of law: (1) the standard by which the court is to judge the fiduciaries' actions in this case; (2) whether a determination that no more than adequate consideration was paid for USCC stock (should the court so find) renders harmless any failure by the trustees to conduct a reasonably prudent investigation into the price of said stock; and (3) the point in time at which any loss to the plan is determined, and the measure of such loss. In considering these questions, the court has analyzed the relevant case law regarding ERISA-governed plans, as well as the briefs filed by the parties on these issues, and has reached the following conclusions: (1) the trustees' conduct in this case is judged by the "prudent person" standard of care, "the highest known to the law," *Donovan v. Bierwirth*, 680

---

4. "Adequate consideration" is defined thus: "in the case of an asset other than a security for which there is a generally recognized market the fair market value of the asset as determined in good faith by the trustee or named

fiduciary pursuant to the terms of the plan and in accordance with the regulations promulgated by the Secretary." 29 U.S.C. § 1002(18)(B).

F.2d 263, 272 n. 8; (2) a prohibited transaction under § 406 may be found even when, coincidentally, the ESOP paid no more than fair market value for employer securities, if the trustees failed to conduct a prudent investigation into the price of the stock under the circumstances then prevailing; [5] and (3) overpayment by the ESOP for employer securities constitutes a loss to the plan, measured by the difference between the purchase price paid and the fair market value of the stock at the time of the transaction.

*Standard of Review Applicable to the Defendants' Conduct*

■ The fiduciary standard applicable to ESOP trustees, set out in ERISA § 404, is indisputably rigorous. The defendants, however, contend that their actions are to be given deference and reviewed under the "arbitrary and capricious" standard. The support for their argument stems from a line of cases including *Kuper v. Iovenko,* 66 F.3d 1447 (6th Cir.1995), and *Moench v. Robertson,* 62 F.3d 553 (3rd Cir. 1995). In *Moench,* the Third Circuit addressed the question of the extent to which ESOP fiduciaries could be liable "for investing solely in employer common stock, when both Congress and the terms of the ESOP provide that the primary purpose of the plan is to invest in the employer's securities." *Moench,* 62 F.3d at 556. In that case, ESOP trustees had continued to invest in the employer's common stock in spite of the "continual and precipitous drop in its price and despite the [trustees'] knowledge of [the employer's] pre-

carious condition by virtue of [their] status as directors." *Id.* at 558. The court examined, at length, the nature and purpose of ESOPs, which are created to invest in employer securities; indeed, the court observed that "[w]hile fiduciaries of pension benefit plans generally must diversify investments of the plan assets 'so as to minimize the risk of large losses,' see section 1104(a)(1)(C), fiduciaries of ESOPs are exempted from this duty." *Id.* at 568. Moreover, ESOPs play dual roles as both employee benefit plans and "technique[s] of corporate finance." *Id.* at 568–69. Attempting to strike a balance between these two roles, the court held that deference was required in reviewing ESOP fiduciaries' decisions to invest in employer securities; to hold them to a stricter standard "would render meaningless the ERISA provision excepting ESOPs from the duty to diversify. Moreover, we would risk transforming ESOPs into ordinary pension benefit plans, which then would frustrate Congress' desire to encourage employee ownership." *Id.* at 570. Thus, the court held that reviewing courts "should not undertake a de novo review of the fiduciary's actions.... Rather, the most logical result is that the fiduciary's decision to continue investing in employer securities should be reviewed for an abuse of discretion." *Id.* at 571. The *Kuper* case, decided shortly after *Moench,* adopted its reasoning and conclusion regarding the standard of review applicable to fiduciary decisions regarding investment in employer securities.[6]

---

5. *See Chao v. Hall Holding Co.,* 285 F.3d 415, 437 (6th Cir.2002).

6. In *Kuper,* as in *Moench,* ESOP participants sued their trustees, alleging breach by failing to diversify the ESOP's holdings during an eighteen-month period in which the employer's stock decreased in value. After dis-

cussing the tension created by ERISA's "competing concerns" with (1) encouraging the formation of ESOPs by making them useful tools of corporate finance, and (2) exhorting ESOP trustees to act solely for the benefit of plan participants, the court adopted the *Moench* court's reasoning and

While *Kuper* and *Moench* seem to provide persuasive authority for according deference to the fiduciaries' decisions in this case, review of *Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir.1983), reveals that the defendants' reliance on those cases is misplaced. As in the present case, *Cunningham* involved an allegation that the ESOP trustees breached their fiduciary duties by causing the ESOP to purchase stock for more than adequate consideration; the plaintiffs charged the defendants with violating both the general fiduciary standards of ERISA § 404 and the prohibited transaction rules of § 406. The court in *Cunningham* discussed the interplay of these two sections, characterizing § 406 as a "supplement to the general duties imposed on fiduciaries by Section 404," and stating that "[t]he object of Section 406 was to make illegal per se the types of transactions that experience had shown to entail a high potential for abuse." *Cunningham*, 716 F.2d at 1464–65. Recognizing the exemption from liability for self-dealing provided to ESOP fiduciaries where adequate consideration is paid, the court held, nonetheless, that "[t]hough freed by Section 408 from the prohibited transaction rules, ESOP fiduciaries remain subject to the general requirements of Section 404," that is, the prudent person standard. *Id.* at 1467. "Thus, although payment of adequate consideration is a statutory defense only to a violation of Section 406, and not of Section 404, under the Secretary's theory of this particular case [that the defendants breached their general fiduciary duties under § 404 by overpaying for the stock], our inquiry will be the same." *Id.* at 1465.

So too, in the present case, the plaintiffs' basic theory of breach is that the defendants, in their zeal to close the transaction and purchase Clifford Todd's stock, caused the ESOP to pay too much. The plaintiffs allege violations of both § 404 and § 406, but, pursuant to *Cunningham*, our inquiry will be the same under each section. Unlike *Cunningham*, *Kuper* and *Moench* alleged breach in the form of failure to diversify ESOP holdings; in adopting the arbitrary and capricious standard of review, they emphasized the ESOP fiduciary's exemption from the duty to diversify contained in § 404. Although dicta in these cases supports extending such reasoning to the case of an ESOP fiduciary accused of overpaying for employer securities, *Cunningham* confronts this situation head-on and applies the prudent person standard. Because *Cunningham* is more factually and legally on point, it is better precedent, and we will follow it by applying the more rigorous standard of review to the defendants' actions in this case. Moreover, our research regarding the two remaining legal issues confirms the correctness of this approach.

*The Framework of Analysis Under ERISA § 406*

 The other two issues of law disputed by the parties are resolved by review of the analytic process by which breaches of § 406 are judged; as an initial matter, the defendants misconstrue the burden of proof and the framework applicable to this analysis. They rely on case law which has developed regarding breach-of-duty claims under ERISA § 404 and provides for a three-step analysis. "ERISA plaintiffs bear the burden of proving a breach of fiduciary duty and a prima facie case of loss to the plan .... Once the plaintiff has satisfied these burdens, 'the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by

---

held that "a proper balance between the purpose of ERISA and the nature of ESOPs requires that we review an ESOP fiduciary's decision to invest in employer securities for an abuse of discretion." *Kuper*, 66 F.3d at 1459.

... the breach of duty.'" *Roth v. Sawyer–Cleator Lumber Co.,* 16 F.3d 915, 917 (8th Cir.1994) (quoting *Martin v. Feilen,* 965 F.2d 660, 671 (8th Cir.1992)). This court has already determined, however, that the plaintiffs' claims under ERISA § 406 are the gravamen of this case, and that section operates under a different framework. The framework applicable to § 406 is clarified in *Reich v. Hall Holding Co.,* 990 F.Supp. 955 (N.D.Ohio 1998), *aff'd by Chao v. Hall Holding Co.,* 285 F.3d 415 (6th Cir.2002). In *Reich v. Hall Holding,* the court reiterated *Cunningham's* holding that ESOP fiduciaries who aspire to the exemption of § 408 nevertheless remain subject to the stringent standards of § 404; thus, in order to invoke the exemption, the fiduciaries bear the burden of proving adequate consideration. *See Reich v. Hall Holding,* 990 F.Supp. at 963 (" 'the ESOP fiduciaries will carry their burden to prove that adequate consideration was paid by showing that they arrived at their determination of fair market value by way of a prudent investigation in the circumstances then prevailing' ") (quoting *Cunningham,* 716 F.2d at 1467–68). Further, "the definition of 'adequate consideration' has two distinct parts. First, there is the 'fair market value' part, then there is the 'as determined in good faith by the trustee' part." *Chao v. Hall Holding,* 285 F.3d at 436 (citing 29 U.S.C. 1002(18)(B)). Thus, this requirement is "unitary and conjunctive," *Valley National Bank,* 837 F.Supp. at 1280, so that "when determining whether 'adequate consideration has been paid', it is not enough that a fiduciary, by chance, arrived at fair market value." *Chao v. Hall Holding,* 285 F.3d at 436–37.

Claims under § 406, therefore, operate under a different analytical framework than those under § 404, as § 406 lacks the causation element and places the burden on the defendants to show that adequate consideration was paid. In *Chao v. Hall Holding,* the Sixth Circuit clarified the differences between the two theories by distinguishing *Kuper,* on which the defendants in that case (as here) had relied:

> [T]he holding in *Kuper* is inapplicable to the present case as *Kuper* only addressed violations of § 404, not § 406.
>
> . . . . .
>
> Further, the Court finds that requiring a causal link between the failure to investigate and the resultant harm in order to prove a violation under § 406 would be contrary to Congress's intent in enacting § 406. Basically, in creating § 406(a), Congress intended to create a category of per se violations ....As one court explained, the reasoning for treating a violation of § 406 as a per se violation is as follows:
>
> > "Congress (in ERISA § 406) intended to create an easily applied per se prohibition ... of certain transactions, no matter how fair, unless the statutory exemption procedures (of ERISA § 408(a)) are followed." ... Lack of harm to the plan or the good faith or lack of same on the part of the borrower are not relevant, and certainly not controlling, under ERISA § 406.

*Chao v. Hall Holding,* 285 F.3d at 438, 439 (quoting *Cutaiar v. Marshall,* 590 F.2d 523, 529–30 (3d Cir.1979)). To the extent case law from other circuits is contrary to this holding, *e.g. Herman v. Mercantile Bank,* 143 F.3d 419 (8th Cir.1998), this court is bound to follow the ruling of the Sixth Circuit.

*The Nature and Measure of Loss*

■ Finally, the parties dispute the nature and measure of loss to the Plan. In order to understand their arguments, it is necessary to review the structure of ESOP transactions generally and of the USCC ESOP transaction specifically.

An ESOP's assets are often derived from tax-deductible contributions from

the employer to the plan in the form of the employer's own stock or cash. If cash is contributed, the ESOP then purchases stock in the sponsoring company. An ESOP may also borrow money from a third party in order to invest in the employer's stock. 29 U.S.C. § 1108(b)(3). This type of ESOP is called a leveraged ESOP.... If a leveraged ESOP is created, the employer is obligated to make cash contributions to the ESOP, which in turn uses the cash to retire the loan debt.

*Reich v. Hall Holding Company,* 990 F.Supp. 955, 957 (N.D.Ohio 1998), *aff'd by Chao v. Hall Holding,* 285 F.3d 415 (6th Cir.2002). The ESOP at issue here is a leveraged ESOP. After its formation, USCC made an initial contribution of $200,000; the ESOP then borrowed money to purchase 66% of the existing shares of USCC. Thereafter, USCC continued to make contributions to the ESOP, which it used to retire the loan debt. The USCC stock purchased by the ESOP was placed in a suspense account within the ESOP to be released over the period of the loan to the individual participants' accounts. As the USCC contributions were used by the ESOP to repay the loan, a proportionate number of the shares held in the suspense account was freed and allocated by formula to the individual accounts of ESOP participants.

The defendants basically contend that the plaintiffs can show no loss to the plan because, even if the ESOP paid too much for the USCC stock, the value of this stock continued to increase after the transaction "and the ESOP received the full value of USCC's contributions in the years following the ESOP transaction ... when the Whitney transaction occurred and all remaining debt was paid by Whitney, with vested plan participants receiving either cash or the equivalent value in stock."[7] The plaintiffs, however, maintain that any overpayment for USCC stock, itself, constitutes a loss to the plan, which is measured by the difference between what the plan actually earned and what it would have earned absent the breach (with doubts or ambiguities resolved against the defendants). While the plaintiffs are correct that an ESOP's payment of more than adequate consideration for employer stock constitutes a compensable loss, they are incorrect about the measure of damages. Key to this issue is the uniqueness of claims under § 406; because only those cases which specifically address these claims provide appropriate guidance, the court so directs its analysis.

Of these, *Reich v. Valley National Bank, supra,* on which both sides rely, is one of the most comprehensive. In *Valley National Bank,* 837 F.Supp. at 1262, the Secretary of Labor sued the ESOP trustee, alleging, as here, that it breached its duty by causing the ESOP to purchase stock in the sponsoring company for more than adequate consideration. Also like the present case, *Valley National Bank* involved a leveraged ESOP.[8] Unlike the

---

7. Record No. 162, at 9.

8. In *Valley National Bank,* the sponsoring company (Kroy) created the ESOP and appointed its trustees; it purchased the company's publicly traded shares for approximately $78 million dollars and then immediately sold the stock to the ESOP. The ESOP paid for the stock with two non-recourse promissory notes made payable to Kroy in the amount of $35.5 million dollars, secured by the unallocated stock sold by Kroy to the ESOP. Kroy was committed to make contributions to the ESOP sufficient to service the notes, and the ESOP was committed to use this money to repay the debt. This method of financing allowed Kroy to take advantage of significant tax benefits and to get a lower rate on its $35.5 million-dollar loan. Indeed, this was the driving force behind the ESOP's creation. *See Valley National Bank,* 837 F.Supp. at 1270.

present case, however, the sponsoring company in *Valley National Bank* "self-destructed in debt." *Id.* at 1270.[9] Because the measure of damages the court awarded after finding a breach was equal to the company's investment in the ESOP, which was worthless after the company's collapse, the instant defendants read *Valley National Bank* as directing that, where a company has not suffered an overall loss such as the one suffered there, there is no compensable loss (despite any overpayment by the ESOP for employer securities). Yet the court directed otherwise, when it opined that "even if Valley's breach involved nothing more than paying too high a price for the stock, Valley would still be liable for the difference between the price paid and the price that should have been paid." *Id.* at 1289.[10]

That price differential was precisely the measure of loss assessed in *Reich v. Hall Holding, supra,* where the district court, upon finding that the ESOP trustees breached their fiduciary duties by failing to conduct an adequate investigation and causing the ESOP to pay too much for the company's stock, awarded the plan $1,049,549.00 plus interest, "which represented the difference between the amount originally paid for the stock and the fair market value of the stock." *Chao v. Hall Holding,* 285 F.3d at 420. This award was affirmed on appeal. *See id.* at 444.

To be sure, the "loss" and "damages" we speak of in the context of ERISA § 406 differ from those elements as contemplated by § 409 (codified at 29 U.S.C. § 1109) and the line of case law including *Donovan v. Bierwirth,* 754 F.2d 1049 (2d Cir.1985).[11] Those cases, however, generally do not involve violations of § 406. For example, *Roth v. Sawyer–Cleator Lumber Co.,* 61 F.3d 599 (8th Cir.1995), which embraces the defendants' argument that the ESOP transactions must be viewed in the larger context of their ultimate success or failure, and rejects the idea of measuring loss in as narrow a time frame as the plaintiffs here advocate, acknowledges that:

> Indeed, the only case in which there could be a loss under this 'snapshot' approach would be when the breach consisted of an overpayment by the ESOP. This measure of loss is appropriate in cases where the loss is due to self-dealing or price manipulation .... However, this case does not involve an overpayment or a breach of trust by self-dealing or price manipulation. In cases such as this, a broader time frame is appropriate.

*Id.* at 603. *Reich v. Hall Holding,* however, involved just such an overpayment. Moreover, the depth with which *Reich v. Hall Holding* addressed the specific issues present in the instant case leads us to regard this case's reasoning as having

9. The ESOP claimed a loss of $17.5 million dollars (the amount still owed by the ESOP on debt created out of the leveraged buyout) minus $250,000 (the amount for which the ESOP had sold its stock) plus interest.

10. The court also observed, in reference to an argument by the Secretary regarding per se violations of ERISA, that "there can be monetary penalties absent proof of actual loss." *Id.*

11. § 409(a) provides that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach ...." *Donovan v. Bierwirth* holds that "the measure of loss under ERISA section 409 requires a comparison of what the Plan actually earned on the ... investment with what the Plan would have earned had the funds been available for other Plan purposes. If the latter amount is greater than the former, the loss is the difference between the two; if the former is greater, no loss was sustained." *Bierwirth,* 754 F.2d at 1056.

more precedential value than *Crawford v. Lamantia*, 34 F.3d 28 (1st Cir.1994), which the defendants also cite.[12] Even more importantly, the Sixth Circuit's affirmance of *Reich v. Hall Holding* in *Chao v. Hall Holding, supra*, is binding on this court.

Furthermore, in analyzing whether a breach had occurred, the courts in *Valley National Bank* and the *Hall Holding* cases discussed and rejected several arguments which have also been made in this case, and which bear mention. These arguments center around two related assertions: that no loss occurred because (1) the creation and funding of an ESOP amounts to a gift from the sponsoring company to the participants, and (2) the leveraged nature of the transaction renders any overpayment for stock harmless to the ESOP. The first assertion urges that, were it not for the benefits sponsoring companies reap (in the form of tax advantages and lower interest rates) from establishing ESOPs, they would never come into being; thus, there can be no loss when the only alternative to the breach is simply not to have an ESOP. The court in *Valley National Bank*, however, aptly deemed this argument "bizarre," noting that "[i]t would apparently immunize from money damages all trustees of ESOPs created by LBOs [leveraged buyouts] or ESOPs where the trustees' actions were contemporaneous or involved with the creation of the ESOP, regardless of the conduct of those trustees, and regardless of the consequences of that con-

duct." *Valley National Bank*, 837 F.Supp. at 1284. The court reiterated that ERISA plans are created for the exclusive benefit of participants, and that "[i]t is not proper to establish and administer an ESOP for the exclusive purpose of wringing tax benefits from the Government." *Id.* at 1286. The court concluded that to accept the argument that "an ESOP could participate in the leveraged buyout of the sponsoring entity and pay any price per share possible, without suffering any loss no matter how dear the price" would render useless the requirement of adequate consideration in § 408. *Id.* at 1287. Contrary to defendants' first assertion, then, "[e]mployee benefits are not a mere gratuity, ... but a form of deferred wages." *Id.* at 1286–87. *See also Reich v. Hall Holding*, 990 F.Supp. at 960–61.

The defendants' second assertion relies on the testimony of Cate Elsten in contending that, even if Jeffrey Risius is correct regarding the alleged overpayment for USCC stock, his conclusion as to loss is wrong because it ignores the leveraged nature of the ESOP transaction. This argument includes two scenarios. The first is that, assuming there was overpayment for the stock, the ESOP was no worse off:

A day after the transaction, the ESOP would have 'paid' nothing for leveraged shares of USCC stock and would have no perfected interest in USCC. The banks that made the loan to the ESOP

---

**12.** *Crawford* addressed the issue of whether a former employee, who had been terminated, had standing to pursue claims against ESOP trustees for an alleged breach of fiduciary duty (causing the ESOP to pay more than adequate consideration for stock in breach of § 406). As one part of its reasoning, the court held that the plaintiff lacked standing because he could not show any direct impact on his benefits by the transaction (since he had been terminated and had collected all benefits due him from the ESOP). In so

ruling, the court emphasized the leveraged nature of the transaction (which will be discussed below) and also distinguished *Valley National Bank* as a case in which the company actually suffered due to the overvaluation, unlike the situation in *Crawford* (and here). While this case did involve an alleged violation of § 406, it is primarily about standing, and the depth of its pertintent analysis does not compare to that of *Valley National Bank* and the *Hall Holding* cases.

would have had no recourse to the ESOP or its participants. The actual consequences of the loss would have fallen solely on USCC, its perfected shareholders and individual guarantors (McQueen and Thompson) and, in the event of a default, the banks.[13]

The *Valley National Bank* transaction, however, was similarly leveraged; "[t]he ESOP's obligation to make payments on its promissory notes was effective under the Plan documents only upon contributions being made by Kroy to the ESOP. Thus, the ESOP obtained its six million shares without any initial cash outlay." *Valley National Bank*, 837 F.Supp. at 1273. The court nevertheless deemed it "irrelevant how the ESOP got the $35.5 million in cash in regard to the question of whether the ESOP paid more than fair market value for the stock." *Id.* at 1274. Moreover, in finding that the amount paid for the stock was not fair market value, the court found that the company had, in its valuation, "justif[ied] the purchase of stock by the ESOP at the price of $5.92 per share by limiting its analysis to comparing the actual offer to one made to hypothetical buyers 'on the same terms and conditions as sold to the ESOP'" which were "'with no money down, no cash at risk, and on the basis of a non-recourse note dependent upon payments by the company.'" *Id.* at 1282. The court held that this approach improperly changed the valuation from "an analysis of the fair market value of the shares into a determination of the stock's investment value to the ESOP," which would justify any price for the stock, provided that someone was guaranteeing payment of the purchase, and the guarantee was reasonable. *Id.*

The second scenario contained in the defendants' "leveraged" argument is that,

"[h]ad the ESOP paid the amount claimed by Risius as fair market value, even assuming that the ESOP transaction could have taken place, the ESOP would have taken out a smaller loan, thereby lowering the principal and interest payments made by USCC. The same amount of USCC shares, however, would have been placed in the ESOP participants' accounts."[14] In support of this assertion, the defendants return to *Crawford, supra,* where the court ruled that the plaintiff lacked standing because: (1) his termination and collection of all benefits due him from the ESOP rendered him outside the definition of "participant" in the first prong of *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); and (2) he could not show a "colorable claim" to vested benefits under the second prong of *Firestone,* because he failed to prove that the alleged breach of fiduciary duty (causing the ESOP to pay more than adequate consideration) had a "direct and inevitable effect on *his* benefits." *Crawford,* 34 F.3d at 33. Specifically, the defendants point to the following reasoning:

Defendants borrowed funds from ADL to acquire a set number of ADL New Shares, i.e., 546,520. Had defendants not overvalued the shares, they would not have borrowed as much money from ADL. Instead, a recalculation of the price of the stock would have resulted only in a smaller loan, lower principal and interest payments to be paid quarterly by ADL, and the same number of New Shares placed in the suspense account. It would *not* have resulted in a similar loan being made to the ESOP with any excess cash to be distributed to the accounts of the participants. The borrowed funds were not available for

---

**13.** Record No. 162, at 12.

**14.** Record No. 162, at 12.

distribution; they were to be used *exclusively* to buy stock, or in the alternative, to pay back the loan.

*Id.* The Sixth Circuit rejected such a scenario in *Chao v. Hall Holding, supra,* however:

At the time the ESOP acquires the stock, it is in the ESOP participant's best interest to do so at the lowest price possible. The lower the price of the stock, the more shares that can be purchased by the ESOP, assuming the investor will invest the same amount without regard to the price per share. Further, a higher return on investment can be generated with a lower purchase price.

• Although it is true that in the present case defendant GFGI only wished to sell 9.96% of Hall Holding stock, it is easy to see why a lower stock price would benefit the ESOP in a factual scenario similar to the present case. In the present case, the transaction was structured as a leveraged ESOP. In order to complete the transaction, the Master Trust loaned the Hall Chemical ESOP $3.5 million to purchase the shares. As the district court explained in its initial opinion, the 110 shares of Hall Holding were placed in a suspense account. . . . Hall Chemical made cash contributions which were used to retire the $3.5 million loan. As each payment was made, a corresponding amount of stock was released from the suspense account and placed into the individual participant's accounts. Assuming that the Hall Chemical ESOP would have paid the amount the district court determined was proper, $2,450,451.00, the participants in the Hall Chemical ESOP would have benefitted. Because the amount of the debt would have been more than $1 million less than the actual purchase price of $3.5 million, it could have been retired much more quickly. Consequently, participants in the Hall Chemical ESOP

would have been fully vested in the 110 shares of Hall Holding stock sooner.

*Chao v. Hall Holding,* 285 F.3d at 442–43. The court also found that "[h]ad the stock been purchased at a lower price, the plan participants could have purchased more shares and realized a larger return." *Id.*

In the face of this well-reasoned and binding precedent in the context of an identical factual setting, this court adheres to *Chao v. Hall Holding's* determination that, when an ESOP overpays for shares of the sponsoring company, it suffers a loss. *See id.* at 444. Accordingly, we will proceed to the question of whether there has been a breach of § 406; if that is the case, loss will be measured as the difference between what the ESOP paid for the USCC stock and its fair market value at the time of the transaction, plus interest.

*Breach of § 406*

These defendants, as ESOP fiduciaries, were required to discharge their duties (the "highest known to the law," *Donovan v. Bierwirth,* 680 F.2d 263, 272 n. 8) with "an eye single" to the interests of the ESOP participants. *Chao v. Hall Holding Co.,* 285 F.3d 415, 434 (6th Cir. 2002). Further, it is their burden to show, by a preponderance of the evidence, that they conducted a reasonably prudent investigation into the value of the stock the ESOP was purchasing. They have not met this burden.

The price paid by the ESOP for the Todd shares was not reached through negotiations between the ESOP and Todd. Thompson testified that he did not know how the price was reached (Tr. 4/17/01, 158:22–24) and McQueen testified that he did not negotiate with Todd and that the Todd price simply reflected the amount he already knew that Todd wanted for his interest in the company. *See* Tr. 4/26/01 5:21–8:16. Todd testified that there were no negotiations, and that the trustees sim-

ply told him what the ESOP could offer, and he accepted that amount. Todd further noted that if they had approached him on "a bad [stressful] day," he might have accepted as little as $10 million for his interest. *See* Tr. 4/16/01 59:12–60:7; 97:3–12.

Nor did the trustees negotiate the price the ESOP agreed to pay to USCC for the newly issued shares. Again, Thompson conceded that he did not know how the price in the USCC SPA was determined, nor how the final price of $19,524,253.25 that the ESOP paid to USCC was determined. *See* Tr. 4/17/01 164:22–165:1. McQueen testified that he did not negotiate this price (Tr. 4/26/01 32:16) and that the price paid for the newly issued shares was intended to be, and was, exactly the amount of USCC's existing debt prior to the ESOP transaction, plus expected closing costs. *See* Tr. 4/26/01 36:25–37:4. Kerrick verified McQueen's testimony. *See* Tr. 4/17/01, 46:15. McQueen felt no need to negotiate the price to be paid on behalf of the ESOP because he believed that the price paid by the corporation for the ESOP shares was a bargain. *See* Tr. 4/26/01, 32:10–18. McQueen testified that absent the ability to restructure corporate debt, the ESOP would not have been pursued. *See* Tr. 4/26/01, 38:7–18; 29:1–8; Tr. 7/17/01 107:8–13. Thus, in December 1993, in determining to pursue the ESOP approach, the trustees preliminarily agreed to purchase a total of 89 shares of USCC stock at a price of $347,222/share, or 222.5 shares at $138,888.80/share, adjusted for the stock split. The trustees entered into these agreements without negotiating the price, without the benefit of any valuation work, and at the price suggested in Kerrick's hypothetical Scenario IIb.

Moreover, the ESOP, once established, had no independent representation. Throughout their tenure as ESOP trustees, Thompson and McQueen also remained officers of USCC. After the ESOP transaction, they were the only shareholders of the corporation, aside from the ESOP itself. The idea of having independent counsel and/or trustees for the ESOP was raised, but Thompson and McQueen rejected it. *See* Tr. 10/9/01, 163:10–13; Tr. 2/25/02, 129:25–130:10. However, the trustees exhibited confusion at trial as to whether the people they dealt with represented the ESOP. McQueen testified that they retained Goodman as attorney and Kerrick as accountant as part of the ESOP "team" that would advise them as to all aspects of the ESOP transaction. *See* Tr. 4/24/01, 211:21–24. Thompson had testified at his deposition that Goodman represented the ESOP, then after a lunch break in the deposition changed his answer to state that Goodman represented USCC, as there was no ESOP attorney at the time of the ESOP transaction. *See* Tr. 4/17/01 140:11–141:2. At trial, when asked about this change, Thompson said that he changed his deposition testimony on the advice of counsel, which he termed "extremely poor legal advice." *See* Tr. 4/17/01, 141:17–142:1. Thompson then testified that Goodman represented the ESOP (Tr. 4/17/01 142:3 6), but that Goodman may have done work for USCC as well. Tr. 4/17/01 145:2–9. McQueen first testified at trial that Goodman represented the ESOP and did not represent the company. *See* Tr. 4/24/01 210:9–10. Once refreshed by his deposition testimony that Goodman "wore two hats," McQueen conceded that Goodman also represented the company, *see* Tr. 4/24/01 210:21–215:4, yet later testified that Goodman "was the attorney for the ESOP in my mind. I mean, he-he was the captain of the ship." *See* Tr. 7/17/01 39:17–18. Siegel confirmed that Goodman was representing both USCC and the ESOP: "He was our customer's counsel and ESOP counsel . . . .

[H]e was present with U.S. Corrections Corp. and its ESOP trustees as their counsel, just as the bank would have had its own counsel present." *See* Tr. 4/24/01, 61:20–25. Goodman himself was very clear that he represented USCC and not the ESOP. *See* Tr. 10/9/01 162:16–163:4. As regards Kerrick, he was hired to do the valuation after initially advising USCC as to the structure of the ESOP. The trustees did not retain a third-party financial advisor in addition to Kerrick. To some extent, the overlap of representation may be inherent in the establishment of ESOPs, which are created by companies in order to purchase company stock; nevertheless, the trustees' confusion regarding who represented the ESOP underscores the troubling lack of independence the ESOP and its trustees exhibited going into the valuation and stock purchase.

Additionally, the entire transaction was subjected to a compressed time frame, due to a closing deadline imposed by Cliff Todd. The stock purchase agreement between Todd and the ESOP expired March 15, 1994. Thompson and McQueen were concerned that if the ESOP loan were not closed by that date, Todd might sell his shares not to the ESOP, but to some other unidentified buyer who would wrest control of USCC from them. *See* Exh 25, at 668 (Joy Siegel wrote that "[i]f the shares have not been purchased by [the deadline], Mr. Todd states that he will pursue subsequent offers which he has received. The other principals of the corporation, Milton Thompson and Robert McQueen, would like to maintain their management control, and therefore, they feel that it is in their best interest to meet the March 15th deadline.") All parties concerned took the March 15 deadline seriously; indeed, McFerran in his deposition noted a "sense of urgency" and referred to the targeted closing date as "Mission Impossible." *See* McFerran Deposition Transcript at 89; Tr. 7/16/01 27:17–28:3.

The defendants and Kerrick downplayed the time constraint in their testimony at trial, maintaining that the process was ongoing, featured several meetings between the trustees and Kerrick regarding his progress on the valuation, and included reviewing several drafts, though everyone admits that there was a flurry of activity in the two weeks leading up to the transaction. The plaintiffs, however, paint a very different picture, using the documentation of this activity obtained in discovery; this picture includes a disturbing coincidence. On March 8, 1994, Kerrick sent a letter to McFerran at the Bank, stating that he had reached a preliminary conclusion that the value of USCC stock to be purchased by the ESOP was $138,888.80/share. *See* Exh. 21. That per-share price, however, was identical to the per-share price supposed in Kerrick's hypothetical Scenario IIb. *See* Exh. 3 at 685. Scenario IIb supposed a value of $347,222/share, but that did not include the 2.5-to-1 stock split. $347,222 divided by 2.5 equals $138,888.80, or precisely the per-share price of the March 8 preliminary valuation letter. In fact, this same calculation is reflected in Kerrick's work papers. Exhibit 20, page 536, shows that Kerrick divided $15,624,990 (the price set in Scenario IIb) by 112.5 (the number of shares owned by Todd), to yield $138,888.80. Thus, as of March 8, 1994, one week before the deadline to close the deal, Kerrick's opinion of the value of USCC was exactly the same as his initial assumption three months earlier in Scenario IIb.

The March 8 letter (Exhibit 21) and the work papers (Exhibit 20) also show that as of March 8, Kerrick assumed that the trustees still intended to implement Scenario IIb; *i.e.*, the ESOP would pay $15,624,990 to buy out Todd, and USCC would restructure its existing debt as ESOP debt. Kerrick's work papers (Exhibit 20) further indicate that as of March 8, Kerrick did not know the exact amount

of such existing debt, and his calculations as of that date indicated that USCC would end up issuing 125 new shares and that the ESOP would own 237.5 of 365 total shares, or 65% of the total outstanding. Those calculations are also reflected in the March 8 letter, as it indicates that the ESOP would purchase "approximately 238" shares of USCC.

In his March 8 preliminary valuation letter, Kerrick stated that he had received the real estate appraisal letters "yesterday," or March 7, 1994. These letters had been faxed to him by the Bank on March 7 (Exh. 18), and stated what the real estate appraisers had at least preliminarily concluded to be the value of the various properties owned by USCC.[15] These facts at least call into question whether Kerrick had begun meaningful valuation work on the USCC stock as of the week before the transaction was to close.

At trial, the defendants and those they worked with, including Kerrick, disputed that any "backing in" of the valuation had occurred, and maintained that the trustees repeatedly met to discuss the valuation and review drafts. Their testimony, however, was generally vague and unsupported. Neither of the trustees, nor Kerrick, retained any copies of any of the alleged drafts, although the plaintiffs tout Exhibit 22, which appears to be a valuation and was found in the files, as a draft. See Tr. 4/17/01, 52:21–53:4; Tr. 4/26/01, 44:2–10. Kerrick's billing records do not include any reference to drafts or to discussions about such drafts. See Exh. 40. Thompson re-

called that he reviewed "several" drafts, all generally in the format of Exhibit 22 (though he did not remember it specifically). See Tr. 4/17/01 166:5–167:7. McQueen testified that they had four or five meetings with Kerrick to discuss drafts, but that he did not remember any particular numbers from these drafts, and his principal complaint was that Kerrick was being too conservative as to the value of the company. See Tr. 4/26/01 46:3–47:7. Kerrick testified that he was "sure" there were drafts, "three, four perhaps" of them (Tr. 4/17/01 51:13, 17–22), but he could not recall whether his files contained any such draft reports. Tr. 4/17/01 52:21–53:10. His billing records do not indicate any meetings with the trustees during February or March about those drafts. See Exh. 40; Tr. 10/9/01, 13:4–7. Kerrick indicated that he was "sure" that there must have been discussions about the drafts (Tr. 4/17/01 51:11–13), but he could not recall having any discussions about Exhibit 22 with the trustees. See Tr. 4/17/01 56:20–21.

As to Exhibit 22, the defendants objected strenuously to its characterization as a "draft valuation," maintaining instead that it was merely among Kerrick's work papers (though counsel admitted that this dispute might be an issue of semantics). Exhibit 22, however, was in exactly the same format as the final valuation, and Kerrick conceded that his firm had prepared it. See Tr. 4/17/01, 52:3–55:8. Exhibit 22 is undated, but its contents suggest that it was prepared in early March, perhaps no earlier than March 11, 1994.[16]

---

15. The real estate appraisers could not finish their reports on time, so the Bank (and Kerrick) relied on preliminary letters from the appraisers. The Bank received the last of the preliminary real estate letters on March 7, and then faxed them to Kerrick on that same date. See Exh. 18. These appraisal letters, not the full reports, then became the basis for the "adjusted book value" used in the valua-

tion that Kerrick ultimately prepared. See Tr. 10/9/01 (Kerrick) 24:9–14.

16. First, Exhibit 22 in Schedule XIV, page 1499, contains projections that were prepared by Gary Harbin (USCC's outside accountant). Those projections (found also in Exhibit 36 at 799) were not prepared until March 3, as the computer run date on Exhibit 36 indicates. Second, the draft valuation contains Kerrick's

Also, though the final valuation report was dated March 7, 1994, C & M's checklist (Exhibit 28) indicates that Kerrick proofread the financial statements on March 12, 1994, and that the statements were assembled on March 15, 1994.

Thus, the objective evidence, as distinguished from the rather self-serving testimony of the trustees, indicates, at the very least, that the valuation process was significantly compressed and driven by Todd's deadline for the closing. While all transactions have a closing deadline, and mere time compression does not necessarily indicate inaccuracy, the evidence thus far certainly does not aid the trustees in their efforts to show that they arrived at the purchase price paid by the ESOP by means of a reasonably prudent investigation.

The substance of Exhibit 22, moreover, raises questions as to the prudence of the trustees' investigation into the value of the stock. Exhibit 22, which consists of numbered schedules (with no cover letter or introduction), appears to have used data identical to Kerrick's final report (Exh. 30). In Schedule XIV, however, Exhibit 22 used conservative income statement projections, whereas the final report used more optimistic projections. *Compare* Exh. 22, page 1499, with Exh. 30, page 201. Exhibit 22's two discounted future earnings methods estimated that USCC was worth $13,054,000 and $26,040,000, respectively. In contrast, these methods in the final report, using more optimistic projections, estimated that USCC was worth $57,670,000 and $56,934,000, respectively.[17]

calculation for "Adjusted Book Value" on page 1511 of $34,029,000. That calculation is the same as that contained on page 213 of the final report (Exh. 30), and the numbers are derived from the real estate appraisal letters (Exh. 18) faxed to Kerrick on March 7. Kerrick calculated the adjustment to book value in Exhibit 19, where he listed the various properties and their appraisals as reflected in the letters he had received the day before. He then added the pertinent appraisals, made some accounting adjustments, and concluded that USCC's book value should be adjusted upward by $29,911,397. This same figure, rounded to $29,911,000 appears in the draft valuation (Exh. 22) in Schedule VII, page 1487, on which the adjusted book value figure of $34,029,000 is calculated. Third, the draft valuation states, on its first page (1474), item number 4, that there were 393 shares outstanding in USCC. Again, this number could not have been calculated until after March 8. On March 8, Kerrick had sent the preliminary valuation letter (Exh. 21) indicating that the ESOP would end up owning "approximately 238 shares representing approximately 65% of the total [365] outstanding stock" of USCC. Thus, on March 8, Kerrick was operating under the assumption that there would be 365 shares. *See also* Exh. 20, reflecting 365 shares in the work papers. Kerrick could not have arrived at 393 as the number of shares until he received a copy of the bank's commit-

ment letter dated March 11, 1993. *See* Exh. 24A, setting forth a total amount to be loaned to the ESOP of $34,416,633. Kerrick used this loan figure in his work papers (Exh. 23, page 454) to calculate the number of shares outstanding once the ESOP had been implemented, and he concluded that there would be 393.479 shares, which was adjusted upward slightly to 393.56. Thus, the actual documentation of these components indicates that Exhibit 22 was prepared in early to mid-March. At trial, however, Steve Kerrick disputed that this was the necessary conclusion, repeatedly indicating that he "could have" received various information preliminarily, and that the dated documents only reflected final confirmation. The vague nature of this testimony, however, coupled with Kerrick's inability to recall whether evidence of any such preliminary calculations were contained in his files, detracts from its weight considerably.

**17.** Also, Exhibit 22 contained two separate valuation summaries, on pages 1511 and 1514. These two pages contain the same data, and differ only in the "weights" assigned to the "Discounted Future Earnings" estimates of value that had been calculated from Harbin's projections. On page 1511, Kerrick assigned a "weight" to these estimates of 7.50 each (out of a total weight of 28 for all methods), and on page 1514, he assigned them a weight of 4.00 each (out of a

Again, the defendants objected vigorously to the plaintiffs' conclusion that Exhibit 22 constituted a "draft valuation." Kerrick characterized it as "just another set of scenarios that we were apparently asked to run," said it was never presented to the trustees as a preliminary figure or a draft, and claimed that it did not represent his opinion as to the value of the company. Tr. 7/18/01, 31:17–33:10. This vehemence, however, came later in the trial, whereas in his initial exchange with plaintiffs' counsel, he referred to it as a "draft printout." Tr. 4/17/01, 73:21. McQueen testified that he never saw any report that valued the company at under $50 million. *See* Tr. 4/26/01, 55:19–21. Gary Harbin, USCC's accountant, when examined by the plaintiffs' counsel, testified that he had seen a draft valuation which came up with a number in the $30–35 million dollar range and which he was "sure" he had discussed with Thompson and McQueen. *See* Tr. 4/26/01, 112:2–16. Later, however, the defendants' counsel pointed out that in Harbin's deposition, he had said that he did not recall whether there had been any preliminary number lower than $53 million, he did not recall any discussion about an initial draft value that was too low, and he would have remembered such a conversation. See Tr. 4/26/01, 136:1–137:11. Nevertheless, the document is in the format of the final valuation, was prepared by Kerrick's office, and is the only document resembling a "draft" in evidence.

Finally, the trustees' own testimony regarding their actions following the completion of Kerrick's valuation is troubling. The following exchange occurred during Thompson's cross-examination:

Q. . . . Do you remember any conversation you had with Mr. Kerrick about his valuation report?

A. Do I remember the details?

Q. Do you remember any conversation at all you had?

A. Yes, we had conversation about it.

Q. What do you remember discussing with Mr. Kerrick?

A. Well, I remember being particularly dissatisfied with the valuation, the cost—I mean the appraisal, the value of the corporation he had come up with. I thought it was worth more. Always did.

Q. You thought the company was worth more.

A. Than the figures he was presenting, yes.

Q. Okay.

A. I do remember that.

Q. And you weren't keeping the company's books, were you?

A. No.

Q. Do you remember any conversation you had with Mr. Kerrick after the valuation was finished?

A. I remember having conversations with him, but I don't remember what was said particularly.

. . . . .

Q. Did you ask him, for example, why he used a net income figure for 1994 of . . . $2,842,000 as opposed—as opposed to $489,000, which had been reported by then?

A. I don't recall asking the question.

Q. You didn't ask him about any number in any of that valuation, did you?

A. I can't recall.

Tr. 4/17/01, 178:9–180:3. When asked whether he questioned Kerrick regarding the methodologies he used, Thompson stated that they were explained, that he

total weight of 21). As a result of the difference in the weighting, the summary on page 1511 concluded that the total value of USCC was $33,469,000, and the summary on page 1514 concluded that USCC's value was $38,109,000. Exh. 22, page 1511 and 1514.

had read the report and thought he understood it, but that he relied on Kerrick's judgment and expertise. *See* Tr. 4/17/01, 180:4–21. Then the following exchange occurred:

Q. So you didn't question anything about his report, right?

A. Other than I wondered about the fact that the corporation was not worth what I thought it was.

Q. But that's the only thing you remember asking about Mr. Kerrick: Why isn't this worth more?

A. Yes.

Tr. 4/17/01, 180:22–181:2. A similar exchange occurred during the cross-examination of McQueen regarding his review of Kerrick's valuation during the ongoing process:

Q. You are saying you had six chances to do these drafts. Did you ever in these six chances that you looked at these drafts ever notice that perhaps he [Kerrick] was using an incorrect number for 1993 net income?

A. No, I—I would not have—I would not have noticed that.

Q. Okay. What other kinds of figures was Mr. Kerrick working with other than historical figures?

A. Uh huh (affirmative response). Well, I—if I saw a number that I didn't think was accurate I would have questioned it. I didn't—you know, if he showed me a figure for net income of 1993, I either thought it was right or I would have questioned it.

Q. Did you have any question—any question or any figure that you questioned in any of Mr. Kerrick's drafts or in his final proposal?

A. I'm sure there were some. I would—my—my—my principal complaints would be that he was being too conservative, frankly; that he was not looking at growth potential for the company; he was not looking at market value for beds.

Tr. 4/26/01, 46:12–47:7.

Having noted these troubling aspects of the trustees' investigation, we return to the case law in gauging their efforts at prudence. In *Donovan v. Cunningham*, the trustees were relying on a valuation which was more than a year old, and the court determined that they "fail[ed] to identify the facts and assumptions underlying the ... appraisal and to consider whether they remained valid at the time of the ESOP transactions." *Donovan v. Cunningham*, 716 F.2d at 1469–70. In *Reich v. Hall Holding*, 990 F.Supp. at 958, the trustees relied on the valuation of the wrong company (Hall Chemical, not Hall Holding). On appeal, the Sixth Circuit found that the trustees were not entitled to rely on this valuation, as the person performing it was not told that he was valuing the company for the purpose of purchase by an ESOP, and he valued Hall Chemical, rather than Hall Holding. *See Chao v. Hall Holding*, 285 F.3d at 430–31. Kerrick's valuation, however, did not suffer from these defects; it was not stale, and Kerrick was aware that the trustees were relying on his valuation for the purpose of ensuring that the ESOP paid no more than adequate consideration, and he valued the correct company's stock.

Nonetheless, the district court in *Reich v. Hall Holding* was primarily concerned with the fact that the trustees exhibited a lack of independence and discretion as to the ESOP transaction, were confused about their roles as trustees, and generally failed to act exclusively for the benefit of the ESOP participants. *See Reich v. Hall Holding*, 990 F.Supp. at 963 ("although the defendants were involved to varying degrees in an investigation into the value of the stock, none of the defendants were investigating nor acting *on behalf of the*

*ESOP "*). The Sixth Circuit, on appeal, confirmed that "the fiduciaries did not 'act for the exclusive purpose' of providing benefits to the Hall Chemical ESOP's participants," *Chao v. Hall Holding,* 285 F.3d at 434, and echoed the district court's discomfort with the trustees' lack of involvement in material respects of the transaction, including the establishment of a purchase price, which occurred without negotiation. This concern resonates in the present case, where everyone agreed that there was no negotiation with Todd as to purchase price, because everyone knew the amount he wanted, and the trustees felt, prior to any valuation, that the amount he agreed to take was a bargain. However, "it [is] not enough for fiduciaries simply to rely on their generalized notions that the company's prospects were good." *Donovan v. Cunningham,* 716 F.2d at 1474.

The trustees' belief, due to their positions as managers and their familiarity with the company, that USCC was worth at least what Kerrick ultimately projected it to be (and much more in their own opinions) was heavily emphasized throughout the trial. Defendants are "entitled to consider the information available to them by virtue of their management positions," but we must look closer to see that this information transcends mere "generalized notions." At trial, much testimony and argument was devoted to various alleged offers Todd received for his share of USCC, which triggered the trustees' concern that the company might be sold from under them and that they would lose control of the company. One such inquiry was from Robertson, Stephens & Co., a national investment firm whose representatives met with Todd and Thompson in 1993. The defendants presented Robertson, Stephens & Co.'s one-page written "Proposal to Recapitilize [sic]" at trial (Exh. 77), which valued USCC at $70 million. The defendants argue that evidence of this "offer" goes to show the trustees'

good faith, not the actual value of the company as of the relevant time period. The court, however, noted at trial that the trustees' recollection of the proposal was rather vague; while Thompson testified that Exhibit 77 was part of the Robertson Stephens proposal, *see* Tr. 4/17/01, 131:23, McQueen denied that he had ever seen it. *See* Tr. 4/24/01, 203:18. Todd, likewise, did not remember it. *See* Tr. 4/16/01, 109:6 and 23–24. Moreover, Todd testified that he did not consider the offer to be concrete, and it was admittedly subject to the performance of due diligence. *See* Tr. 4/16/01, 92:22–24. It is undisputed that Thompson and McQueen rejected the proposal because they did not want to lose control of the company. Indeed, Thompson testified as to friction between himself and Todd due to Thompson's reluctance to sell, which included Todd's throwing the papers at Thompson at one point. *See* Tr. 4/17/01, 134:7.

The defendants also maintain that in January, 1994, another so-called "potential buyer" preliminarily valued USCC at $75 million, and that other groups were also interested in acquiring the company during this time period. While this information, as well as that regarding the Robertson Stephens proposal, was transmitted to Kerrick for consideration in his valuation of the company, it appears to be less documented and even less concrete than the Robertson Stephens proposal. Reliance on these alleged "offers," while perhaps showing subjective good faith at best, certainly does not show prudence. These numbers were put forth prior to the performance of any due diligence and are generally unsupported. Indeed, they seem to be a double-edged sword for these trustees, in that they lend credence to the plaintiffs' assertions that Thompson and McQueen, fearful of losing control of USCC, were predisposed to close the ESOP deal.

Additionally, the defendants place a great deal of emphasis on the Bank of Louisville's efforts in this transaction, contending that Joy Siegel, the bank's credit officer, ran many projections and reviewed Kerrick's valuation report, but found no "red flags," and that Thompson and McQueen reasonably relied on these facts. Neither the Bank of Louisville nor Joy Siegel, however, was in a fiduciary position with regard to the ESOP. The bank was the lender in this transaction and made approximately four million dollars in profits as a result of the transaction. *See* Tr. 7/16/01, 54:7–18. Unlike the ESOP, moreover, the bank had independent counsel throughout this transaction, and Siegel acknowledged that, from her perspective, the most important consideration was that the bank get paid.

The plaintiffs point to several alleged "obvious errors" in Kerrick's valuation report which they contend reasonably prudent trustees would have at least inquired about. One such alleged error is the use of a figure for the company's 1993 net income equal to $2,842,000. The plaintiffs contend, however, that the trustees, as corporate officers, were on notice as of February 3, 1994 (prior to the promulgation of Kerrick's report) that the actual net income figure for 1993 was $488,711.14.[18] When asked about this rather significant difference at trial, Thompson could not recall asking Kerrick why he had used the higher figure. *See* Tr. 4/17/01, 179:22–25. McQueen testified that he thought Kerrick had used the higher number to adjust for officers' compensation and certain non-recurring 1993 expenses, and that he considered this to be justified. *See* Tr. 4/26/01, 62:1–63:23. He also testified, however, that he would not have noticed the discrepancy in reviewing the valuation. *See* Tr. 4/16/02, 46:12–17. Much later in the trial, Thompson echoed

McQueen's explanation of the use of the higher figure and said that it had been discussed in the time period of March 7–15, 1994. *See* Tr. 2/25/02, 142:2–13.

As a matter of law, it is the defendants' burden to show that they prudently investigated the value of the stock purchased by the ESOP. The evidence at trial showed that these defendants embarked upon creating an ESOP in order to retain control of their company; they settled upon a price with the selling principal without negotiation and agreed to a closing deadline imposed by that principal; they became trustees for the ESOP, while remaining corporate officers; they commissioned a valuation of the corporation's stock which was subjected to a compressed timetable, and for which they provided the projections, the end result of which was a value sufficient to consummate the transaction, but their primary review and analysis of which was merely to question why the corporation wasn't worth more. And though *Chao v. Hall Holding* states that it is in the best interest of the ESOP participants to acquire stock at the lowest price possible, *see* 285 F.3d at 442, it is clear that the trustees were not looking at the transaction from that perspective. When asked whether he was concerned that the ESOP might be paying too much for the shares it was purchasing, Thompson stated that "[i]t never occurred to me to be concerned about that. I thought that they were paying a fair value for the company." Tr. 4/17/01, 187:22–188:2. McQueen stated that he knew it was his duty to be concerned with how much the ESOP was paying for the stock, and acknowledged that the ESOP was better off if it paid a lesser amount, but when asked if the ESOP would have been better off had it paid less than the $34 million it ultimately paid, he answered, "Well, it would have been better

---

18. The plaintiffs assert that USCC supplied the data to Kerrick by fax on that date.

off if there had been less debt, yes." Tr. 7/17/01, 123:1–11. Against this backdrop, the court finds the observation made in *Reich v. Hall Holding, supra,* particularly appropriate: "[A]lthough the defendants were involved to varying degrees in an investigation into the value of the stock, none of the defendants were investigating nor acting *on behalf of the ESOP.* Certainly, the defendants were not acting 'solely in the interest of plan participants and beneficiaries' as required by ERISA § 404." *Reich v.Hall Holding,* 990 F.Supp. at 963. This failure is sufficient to show a breach of ERISA § 406 and a prohibited transaction.

In so holding, the court recognizes the practical realities of the creation of ESOPs generally, and this ESOP particularly. This ESOP was created as a tool of corporate finance, designed to enable the principals of a closely held corporation to retain control of their company by buying out another principal who was threatening to sell to "strangers." While this motivation, prior to the creation of the ESOP, is not necessarily improper, it does set up precisely the kind of conflict of interest § 406 was intended to prevent. It is for this reason ERISA requires special scrutiny of these prohibited transactions, the taint of which can be erased only by the most scrupulous of fiduciaries, who must act vigilantly to ensure that the ESOP pays no more than adequate consideration for stock of the sponsoring company. The defendants have not shown, by a preponderance of the evidence, that they did so in this case. Overall, their subjective intent may have been good, and may have *included* benefiting the ESOP participants, but the objective evidence shows that they were unable to transcend their corporate mindset and act solely and exclusively for those participants. In short, the fact that the impetus behind the ESOP's creation was retention of the owners' control (a corporate goal) is not fatal to the transaction; the selection of ESOP trustees who could not, and did not, by virtue of their corporate interest, act with an "eye single" to the ESOP, is.

*Referral of Damages Issue to Special Master*

Much of the testimony at trial involved the merits of Kerrick's valuation, and both sides presented experts who discussed Kerrick's valuation in accounting terms and opined as to the value of the USCC stock in March, 1994. The court views this testimony as going to the measure of loss—that is, what the actual fair market value of the stock was, and whether and how much the ESOP overpaid for it. As this testimony involved complicated and highly technical matters, the court will refer this issue to a special master in accordance with Fed.R.Civ.P. 53, for review of the testimony and exhibits and the issuance of a report.

At trial, both sides indicated that they would be amenable to the consultation of a special master in the court's resolution of these highly technical issues. *See* Tr. 2/26/02, 72:18–74:1; 103:10–17. Additionally, the court gleans support for this method from *Reich v. Hall Holding, supra,* and its affirmance in *Chao v. Hall Holding.* In *Reich v. Hall Holding,* the district court determined that the fiduciaries failed to conduct a prudent and independent investigation into the fair market value of the stock; upon so holding, the court initially thought summary judgment precluded because it was necessary to decide whether an objective, reasonable fiduciary would have concluded that the price paid by the ESOP was too high. Faced with the conflicting views of the parties' experts, the court found itself unable to deduce which party was correct, noting "probable flaws" in each valuation, and therefore found that a genuine issue of material fact existed. *See Reich v. Hall Holding,* 990 F.Supp. at

964–65. On reconsideration, however, the court acknowledged its error and held that "proof of harm or loss resulting from a prohibited transaction is not necessary to establish a violation under ERISA § 406." *Id.* at 967. The court then referred the matter to a magistrate judge to assist in determining the fair market value of the company stock as of the relevant date. The difference between this amount and the amount the ESOP paid was awarded as the measure of loss. *See Chao v. Hall Holding*, 285 F.3d at 423.

In this case, the special master shall review the testimony of Kerrick, Risius, and Elsten and issue a report, within six months of the date of referral, as to (1) the value of the USCC stock purchased by the ESOP in March, 1994, (2) the rationale employed in finding this value, and (3) as to each expert who testified at trial, an explanation of which portions of that expert's testimony the special master finds credible, and which portions the special master finds not credible, and why.

Before the special master's report issues, however, the court will require the parties to attend a settlement conference. Accordingly,

**IT IS ORDERED** that judgment is **ENTERED** for the plaintiffs on the issue of liability, in accordance with this opinion.

**IT IS FURTHER ORDERED** that the parties shall attend a settlement conference with Magistrate Judge Gambill, to whom this matter is **REFERRED** for the purpose of conducting such a conference. The parties shall contact Magistrate Judge Gambill within 10 days of the date of entry of this order, for the purpose of scheduling the settlement conference. Both parties shall attempt in good faith to resolve amicably the issue of damages.

**IT IS FURTHER ORDERED** that, within 15 days of the date of entry of this order, the parties shall **EITHER** file jointly one name of the person who will be the special master **OR** each file separately a list of the names of three persons whom they each propose as a neutral special master in this matter. The proposed persons shall have no connection with the subject matter, parties, or attorneys involved in this case. Accompanying each name shall be a paragraph outlining that candidate's qualifications to serve as special master, including similar prior service. An order of referral pursuant to Rule 53 will thereafter issue. If the parties cannot agree on a special master and do not submit the same name on their separate 3 person lists, the court shall select a special master from the ranks of academia at an accredited university or college or from the extracurricular realms of business or finance.

**IT IS FURTHER ORDERED** that within 15 days of the entry of this order, the parties shall file any proposals for additional subject matter they wish to be included in the order of referral to the special master. These proposals may take the form of a proposed order of referral, to be attached to their respective motions as an exhibit.

**IT IS FURTHER ORDERED** that this order is interlocutory in nature, and may not be appealed.